ELLIS, Judge.
In this suit for workmen’s compensation benefits, the plaintiff, Huey Vidrine, sued Employers Mutual Liability Insurance Company of Wisconsin, the compensation's insurer, Central Excavating Company, Inc. The plaintiff was employed by Central Excavating Company, Inc., on November 23, 1956, when he was allegedly injured during the course and scope of his employment. Vidrine claims that he is totally and permanently disabled as a result of this injury, and therefore, that he is entitled to compensation benefits at the rate of $35 per week for 400 weeks. He also seeks statutory penalties and attorneys fees.
After a trial on the merits, the District Court rendered judgment for the plaintiff, finding that he had a temporary total disability and awarding compensation at the *293 rate of $35 per week beginning November 23, 1956 for the entire period of plaintiff’s temporary total disability not to exceed three hundred (300) weeks, with legal interest on past due amounts, subject to credits for compensation paid through March 1, 1957. Plaintiff was granted a judgment for reasonable medical expenses not to exceed $2,500 and medical expert fees of $50 for each medical expert.
From this judgment the defendant compensation insurer has taken an appeal.
The defendant conceded that Vidrine received the accident during the course and scope of his employment with the Central Excavating Company, Inc. The only question posed by the defendant on this appeal is whether or not the plaintiff has proven that the accident resulted in his inability to perform his usual and customary work on the date of the trial. Plaintiff contends on appeal, that judgment for permanent total disability should be granted since defendant would be fully protected by the provisions of the Workmen’s Compensation Laws, LSA-R.S. 23:1331, concerning the modification of awards.
The facts presented are substantially as follows:
On November 23,1956, Huey Vidrine was employed at heavy labor with Central Excavating Company, Inc. During the course of this employment, he and another employee were carrying a heavy board and Vidrine slipped and fell. This occurred at approximately 10:30 A.M. After the fall, the foreman gave him lighter work to do and after dinner, Vidrine could not work at all. At 3:30 P.M., the shift was over and the foreman took Vidrine to Dr. Ray F. Marceaux, a general practitioner, in Bas-ile, Louisiana. Dr. Marceaux diagnosed it as a lumbosacral strain and found “some complaint of pain in the lumbar region and spasms of the erectus muscles, the big muscles on each side of the spinal column in the back”. Dr. Marceaux taped the affected region and gave Vidrine medication including something to relax the spasms of the muscles and relieve the pain. Thereafter, he gave Vidrine about 25 microtherm treatments. It should be noted that Dr. Marceaux never discharged Vidrine. The report and medical bills from Dr. Marceaux, which is in the record, indicates that Dr. Marceaux did not estimate the date on which the patient would be able to return to work, but merely filled in this portion of the report with question marks. This report was dated April 26, 1957.
Vidrine did not return to Dr. Marceaux’s office on March 8, 1957, for an appointment. According to Vidrine, there was a misunderstanding and he had iio knowledge that he was supposed to return on that date. Dr. Marceaux testified that he did not find-any spasms of. muscles and .he found that motion was not limited because of pain, at the time Vidrine last came to his office.
Dr. Marceaux did not note the tightness of the large muscles in the back of the thigh, commonly known as the hamstring muscles. Over a period of time, Dr. Marceaux concluded that Vidrine’s complaints were not consistent with the nerve distribution and also that Vidrine’s complaints were not genuine, due to a lack of objective findings.
On December 6, 1956, Dr. Marceaux had referred Vidrine to Dr. Charles V. Hatch-ette, an orthopedic surgeon in Lake Charles, Louisiana. At that time, Dr. Hatchette found that the plaintiff had received a mild lumbosacral injury, that the application of a lumbosacral brace of the canvas type would benefit the patient and that the patient should be instructed in hard bed sleeping and complete rest of the lower back for a period of two to three- weeks. Dr. Hatchette felt at this time that the patient would recover within 4 to 8 weeks and that physiological therapy treatments (micro-therm treatments) to the lower back would expedite recovery. Dr. Hatchette examined Vidrine again on January 21, 1957 at which time he did not find any evidence of muscle spasms. On direct examination, Dr. Hatchette stated that he felt that Vidrine was exaggerating his complaints to the extent that he was not being truthful at the *294 time of the second examination, and that Vidrine was physically able to return to work on January 12, 1957. Dr. Hatchette did not mention the tightness of the hamstring muscles.
On February 11, 1957, Dr. Marceaux sent Vidrine to Dr. William L. Meuleman, who practices orthopedic surgery in Lafayette, Louisiana. Dr. Meuleman felt that on the first examination that the patient was able to return to work. He found no muscle spasms in the hack and no other objective symptoms of any injury, although Vidrine complained of localized pain in the lumbo-sacral region. There was no complaint of radiating pain. Dr. Meuleman found in certain of the leg tests that there was a pulling in the hamstring muscles of the leg, “but we battered that around and felt that was muscular and not a radiation type pain.” Dr. Meuleman testified further on this point as follows:
“I have never been favorably impressed with hamstring muscles tightness as a cause of disability per se. I see it often, as I am sure everyone does, and people tell you that it pulls and that is about as far as it goes. I am not impressed. I grant you Vidrine has got a good deal; with him lying down I could only get his legs off the table, with him lying flat I could get his legs off the table 45 degrees bilaterally, and that was all. The only paradox, to me at least, was this: straight leg raising does not rotate the pelvis. When you raise the man’s left or right leg individually, you are not moving his lumbosacral spine one wit; you are moving his hip and this man was so tight where you could practically flick them and you would expect them to sing. He didn’t refer any of the complaints to his legs. Everything was up in his back, which again to my mind I just don’t see how if you don’t shift his lumbosacral spine you can produce pain when you are not testing his lum-bosacral spine.”
At the request of Vidrine’s attorney, Dr. George B. Briel made an examination on May 28, 1957, and again on August 14, 1957. On both of these examinations, Dr. Briel found a slight flattening of the normal lordotic curve and a considerable amount of tightness in the parivertebral muscles in the lumbosacral region of the back. Dr. Briel found that nerve stretch test and sciatic nerve tension caused some pain in Vidrine’s back, but felt that that was a result of the tightening of the muscles.
Dr. Briel concluded that Vidrine had definite spasms of the left lumbosacral region and was not attempting to mislead concerning the gravity of the injury.[1] Dr. Briel’s considered opinion was that with *295 proper treatment Vidrine would be able to overcome his disability within a period of a few months. The treatments recommended were graduated postural exercises done under close supervision. This opinion was qualified by Dr. Briel’s finding that there was the possibility of an injured disc.[2]
This court feels that the District Court, in its reason for judgment, gives a very accurate and concise summary of the laymen’s^testimony which was introduced at the trial of this case and said summary reads as follows:
“Plaintiff produced a number of lay witnesses at the trial, and the Court will here state that it was very well impressed by the manner in which they testified. By this testimony, it is established that Vidrine is an uneducated man, unmarried, who lives in Basile and earns a living as a laborer. His work experience is chiefly farming in character, during planting and harvesting, and he has also worked at Cities Service refinery in Lake Charles prior to working for Central Excavating Company, Inc.
“The lay witnesses, members of the Basile community who have known petitioner all his life, testified that he had a good reputation as a worker. He attempted to work for three of them, Mr. Guillory, a television repairman, Mr. Fontenot, a bar operator, and Mr. Bellon, a farmer who employed him to help in paperhanging at his home. All of these witnesses testified that plaintiff attempted to do his work, but was unable to continue his employment with them because of an obvious difficulty with his back. The duties undertaken by him were not of a heavy nature, and after only a short period of time it became apparent that he was unable to perform the tasks imposed upon him.”
From a careful review of the record presented herein, this Court has come to the conclusion that plaintiff has sustained the burden of proof and established his case by a reasonable preponderance of the evidence, as is required in this type of case. Defendant cites the cases of Williams v. Harris, La.App., 77 So.2d 744; Driggers v. Coal Operators Casualty Company, La.App., 73 So.2d 602, and Hogan v. Stovall Drilling Company, La.App., 55 So.2d 284.
We have no quarrel with the rules and the conclusion in these cases. The rules which were recognized and the conclusions which were drawn in these three cases are inap-posite, because the evidence presented in those cases justified judgments denying a finding of disabling injuries. In the case at bar it does not.
Dr. Marceaux’s testimony is weakened by the conflict between his written report and his depositions. It is also felt, that Dr. Marceaux, being a general practitioner, would naturally be influenced by the specialists whom he called in on the case.
Defendant’s counsel pointed out that Vidrine was under medication to control the pain and the spasms for several months after his injury and, we think this observation is worthy of note. This perhaps explains Dr. Hatchette’s failure to find muscle spasms on his second examination, and Dr. Meuleman’s failure to find muscle spasms on his first examination.
*296 This court feels as does the trial court, that Vidrine did exaggerate the severity of his pains while under the various examinations. This action on his part would normally influence the doctors unfavorably and lead them to doubt the sincerity of his claims and the existence of disabling injury.
These observations are made in an effort to reconcile the testimony of the several doctors who attended Vidrine on the points where they diverged. Be that as it may, this court was quite favorably impressed with the detail and particularity of Dr. Briel’s testimony.
Counsel for defendant cites the case of Green v. A. C. Campbell Construction Co., La.App., 78 So.2d 54, as authority for the proposition that a person may voluntarily hold the muscles of his back tense. From this authority, it is urged that it should be concluded here that Vidrine was voluntarily tightening the muscles in his back to simulate muscle spasm. In the record there is no evidence that plaintiff could wilfully hold part of the muscles of one side of his back in spasm. On the contrary, Dr. Briel testified that the spasms he found could not he voluntary.[3]
Taking into consideration all of the medical evidence and the lay testimony, which was favorable to plaintiff, and which was uncontroverted, it is felt that plaintiff did sustain the burden of proof. It is a recognized rule in Louisiana jurisprudence that mere majority of expert witnesses is not sufficient for the determination of the decision in a workmen’s compensation case. Bean v. Higgins, Inc., 230 La. 211, 88 So.2d 30. A related rule which is also found in our jurisprudence is that in workmen’s compensation cases in which there is found a conflict of medical testimony on a medical question, it was proper for the court to give serious consideration to the testimony of lay witnesses. Rutherford v. Frost Lumber Industries, La.App., 57 So.2d 914.
As stated above, counsel for plaintiff seeks a judgment for total and permanent disability on this appeal. There is no basis for such a ruling in any of the medical testimony found in the record.
For the reasons set forth above, the trial court’s judgment is not found to be manifestly erroneous anid this court will affirm it in all respects.
Affirmed.

. Mr. Fontenot: * * * the doctor testified one side of the pervertebral muscles were tighter than the other side.
“A. Yes, I testified that the one side was apparently free and one side was very tight, and the manner in which I determined that is by several tests. One is having the patient hold on to the examining table while standing on one log, then on the other leg. An individual who has true spasms the tightness of the muscles won’t disappear, but one who is faking, holding their backs tight, you will find the side on which they are standing their muscles will completely relax, while the other side may be held tight, and the reverse with the other leg, and also by having the patient walk while keeping a constant touch on his back and in doing so if they are holding their back tight they will definitely relax it in moving, and this man showed a very definite tightness in the left lumbosacral angle which did not relax on any test.
“Q. Now, you state he was holding to the table. You mind stating how he was holding? A. He was holding on so he could stand on one leg without falling down. Just gently holding on.
“Q. Was he holding with one hand or two hands? A. One hand.
“Q. You state that when he stands on one foot if he did not have true spasms, well then, the muscle group on that side would relax while the other would stay tight. A. Yes. When he raises his leg the muscles on that side would relax completely. If it was true spasm they would tighten, I mean they would remain tight.
*295 “Q. And you state that his remained tight during this maneuver. A. On that side, yes.
“Q. But not on the other side? A. The other side was completely flaccid.”

. “Q. Have you an opinion as to his ability to work at the present time, Dr. Briel?
A. I can’t see any difference in the man’s condition at the present time as when I examined him in May. At the present time he shows a few more changes such as the nerve stretch test causing pain, the hypoesthesia in the portion of his left leg, which may mean something may be forerunner of the possibility that the man may have an injured disc, but he shows no other neurological findings to verify those positive findings.

. “Q. Doctor, perivertebral group of muscles are muscles of varying lengths? A. Varying lengths and sizes and they intertwine. Some of them run a short distance and attach on to the spinous processes and the transverse processes of the vertebrae and they only run four, five, six inches so that you have a very select group of muscles in spasm and the muscles right next to them are perfectly relaxed.
“Q. Did you find the muscles right next to those in spasm relaxed? A. Yes, I didn’t find anything above; L-3 was the limit of his.”